1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF NEVADA**

8

9  HERLINA SNIDER,                                         )        3:07-CV-00583-RCJ-RAM

10              Plaintiff,                                       )

                                                             )        **ORDER**

11  v.                                                       )

12  GREATER NEVADA LLC, et al.,                    )

13              Defendants.                                  )

14

15        Plaintiff Herlina Snider filed the present lawsuit against Defendants Greater Nevada,

16  LLC and Derry Gilmore alleging national origin, age and gender discrimination as well as

17  retaliation and constructive discharge.  Presently before the Court is Defendant Greater

18  Nevada, LLC's Motion for Summary Judgment (#20).  The Court has considered the motions,

19  briefs, pleadings, and oral argument on behalf of all parties and issues the following order.

20  IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is GRANTED in

21  its entirety.

22                                          **I. BACKGROUND**

23        This matter arises out of allegations of national origin, age, and gender discrimination

24  as well as retaliation and constructive discharge by an employee of Greater Nevada LLC d/b/a

25  Greater Nevada Mortgage Services ("Greater Nevada").

26        Greater Nevada CEO Robert Taylor hired Plaintiff Herlina Snider as a Secondary

27  Marketing Specialist in April of 2004 with a starting salary of $35,000 per year.  (Pl.'s Opp'n

28  (#23) 2).  At the time, Plaintiff was forty-two years of age.  (Def.'s Mot. (#20) 2).  After an

1

1 evaluation shortly thereafter, her salary was raised to $40,000 per year. (Id.). In early 2005,

2 she successfully negotiated with CEO Taylor an annual salary of $51,000. (Id.). At the

3 beginning of her employment, Plaintiff reported to CEO Taylor, whom she would see about

4 once a week. (Id.). At the end of 2004, Plaintiff moved to an office next to Taylor and saw him

5 daily. (Id.). They had a cordial working relationship. (Id. at Ex. 1, 6). In January of 2005,

6 Plaintiff attended discrimination and harassment awareness training, for which she signed an

7 acknowledgment. (Id. at 9, Ex. 5). In December of 2005, Snider moved into a different

8 building, away from Taylor. (Id. at Ex. 1, 6).

9    In November of 2005, Taylor hired Defendant Derry Gilmore as Vice President of

10 Mortgage Banking. (Id. at 3). As Gilmore took over some of Taylor's responsibilities, Plaintiff

11 began reporting to Gilmore instead of Taylor. (Id.). On November 28, 2005, Plaintiff offered

12 a suggestion during the first staff meeting that both she and Gilmore attended, along with

13 about seven other employees. (Id. at Ex. 1, 12; Ex. 3, 19). Defendant claims that Gilmore

14 then said to Plaintiff in a firm voice something in the nature of, "Herlina, slow down. I don't

15 understand a single word you're saying." (Id.). Plaintiff, however, contends that Gilmore

16 began "yelling and screaming at [her] in front of other staff members," and that "he kept telling

17 [her] to slow down because people could not understand her Asian accent when she spoke."[1]

18 (Id. at Ex. 2). Plaintiff has a strong accent and can be difficult to understand. (Def.'s Mot.

19 (#20) 3; Ex. 1, 13; Ex. 3, 19). Plaintiff felt humiliated by Gilmore's conduct and felt that he was

20 discriminating against her based on her national origin. (Id.).

21    Some time in early 2006, Plaintiff asked her co-worker Cheryl Bartels if she thought that

22 Gilmore was discriminating against Plaintiff because she was Chinese. Bartels told Plaintiff

23 that she thought he was discriminating against her. (Id. at 3-4). Bartels also told Plaintiff that

24 Bartels suggested to Gilmore that he should be more sensitive to Plaintiff's feelings because

25

26    [1] Plaintiff maintains in her Response (#23) that Gilmore used the phrase "Asian accent"
   during this incident, but cannot point to any evidence supporting that allegation. As such, it
27 is a conclusory statement unsupported by the undisputed facts, even when viewing the
   evidence in the light most favorable to Plaintiff. Conclusory allegations that are unsupported
28 by factual data cannot defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040,
   1045 (9th Cir. 1989).

2

1   "sometimes people in Oriental culture are not as verbal about . . . saying that offended me or
2   please don't talk to me like that," and that Gilmore responded, "I dealt with lots of Japanese
3   people when I worked on Wall Street . . . ." (Id. at 4; Ex. 3, 28).[2]

4       Bartels also told Plaintiff of an incident in December of 2005 where Bartels placed her
5   resume in a pile that Gilmore was reviewing at Gilmore's direction. (Id. at 4; Ex. 1, 14).
6   Bartels' resume had her previous married name, Fong, as well as her photograph. (Id. at Ex.
7   3, 26). Gilmore came out of his office to ask Bartels "where did I get this Cheryl Fong one
8   from?" (Id.). Once Bartels explained that she was Cheryl Fong, Gilmore reportedly "became
9   very red and then he said: Really, you were married to a Chinese man?  Your kids are half
10  Chinese?" (Id.). Plaintiff also reports that around this time her co-worker Mary Porras had
11  told her that Gilmore said he wanted to replace Plaintiff with "some guy that he had in mind."
12  (Pl.'s Opp'n (#23) Ex. 2; Def.'s Mot. (#20) Ex. 1, 19).

13      On April 28, 2006, Mary Porras, Operations Manager, filed a harassment complaint
14  against Gilmore with Human Resources. (Pl.'s Opp'n (#23) 2). Plaintiff and fourteen other
15  employees were interviewed regarding Porras' complaint. (Def.'s Mot. (#20) 7). During the
16  interview on May 9, 2006, Plaintiff told the VP of Human Resources, Gerene Sayre, that
17  Gilmore was mistreating both her and Porras. (Pl.'s Opp'n (#23) 2). She described her issues
18  with Gilmore, including his management style and  the incident in the November 2005 staff
19  meeting where he told her he couldn't understand what she was saying. (Id.). She also told
20  Sayre about the incident where Bartels told Gilmore to be more sensitive because Snider was
21  "Oriental," and that Gilmore replied that he had dealt with "many Japanese on Wall Street."
22  (Id.).  Plaintiff felt this comment was based on her race, but she did not use the word
23  "discrimination" in her interview with Human Resources. (Id.). Plaintiff also related that she
24  felt she was Gilmore's "main target." (Id. at 3; Ex. 1, 15). Sayre also interviewed Bartels on

25  ───────────────────────

26      [2] Plaintiff reports Gilmore's response slightly differently, as something more in that
    nature of, "why do I have to care or have concern about Herlina's feelings. I have dealt with
27  many Japanese on Wall Street in the past." (Pl.'s Opp'n (#23) 2; Ex. 1, 13-14).  However,
    Plaintiff's declaration about what Gilmore said to Bartels is hearsay and therefore inadmissible
28  at summary judgment. In re Sunset Bay Assocs., 944 F.2d 1503, 1514 (9th Cir. 1991).

1   May 9, 2006.  (Id. at 3).  Bartels feels that she indirectly reported that Gilmore was
2   discriminating against employees on the basis of age because she was responding to an age
3   complaint where she reported some of Gilmore's comments that were discriminatory based
4   on age. (Id. at Ex. 4, 6-7). Bartels also feels that she indirectly reported that Gilmore was
5   discriminating against Plaintiff on the basis of national origin and she related the incident at
6   the staff meeting where Gilmore embarrassed Plaintiff.  Bartels admits that she also never
7   used the word "discrimination" in her interview.  (Id.).

8        Sayre found allegations of discrimination by Gilmore to be unfounded, though she did
9   find that a number of employees disliked his management style and felt that he inappropriately
10  raised in voice in meetings and otherwise communicated in an overly-intense and sarcastic
11  manner. (Id. at Ex. 4, 10; Sayre Declaration (attached to Def.'s Mot. (#23))).   Gilmore was
12  counseled on these issues. (Sayre Declaration).  In late May 2006, Porras went on medical
13  leave. (Def.'s Mot. (#20) 9). She resigned shortly thereafter, having never returned to work.
14  (Id.).

15       Some time during that same summer, Taylor directed Gilmore to survey all positions
16  and employees in an effort to determine which ones had the highest pay and which ones could
17  be eliminated, since the company had been losing money and he believed employee
18  compensation and benefits were the highest expenses and the most easily eliminated.  (Id.
19  at Ex. 2, 4). Taylor was looking to eliminate positions in loan processing, underwriting, and/or
20  secondary marketing, but not sales. (Id.). Besides Taylor and Gilmore, the three highest paid
21  employees were Operations Manager Mary Porras (who resigned) at $66,747, Plaintiff
22  Secondary Marketing Analyst Herlina Snider at $51,355, and Executive Assistant Cheryl
23  Bartels at $46,475. (Sayre Declaration).

24       Gilmore reported back to Taylor with positions he thought could be eliminated,
25  including Plaintiff's position as a Secondary Marketing Specialist. (Def.'s Mot. (#20) 11; Ex.
26  2, 10). Taylor approved the elimination of Plaintiff's position because he believed Gilmore and
27  Secondary Marketing Assistant Dionny Fonseca could handle the job.  (Id. at 11; Ex. 2, 6).
28  Fonseca is a female who is two years younger than Plaintiff and was making $27,768 annually

4

at the time. (Sayre Declaration). Plaintiff met with Gilmore and Human Resources Manager Teri Foster on June 9, 2006. (Def.'s Mot. (#20) 12; Ex. 1, 26). They informed her that Greater Nevada was restructuring and that her position was being eliminated. (Id. at Ex. 1, 27). They offered her a commission-based field consultant position, which included no base pay. (Id.). Plaintiff resigned as of June 23, 2006, declining to take the commissioned position. (Complaint (#1) 5).

Taylor and Gilmore also considered eliminating a position in underwriting, but that became unnecessary when Porras went out on leave and subsequently resigned. (Def.'s Mot. (#20) Ex. 2, 11). Finally, they decided to demote Cheryl Bartels from Executive Assistant to Secretary and pay her $10,000 less annually. (Id.).

After Plaintiff resigned, Gilmore and Fonseca handled the Secondary Marketing duties until Fonseca resigned to take another job. (Id. at 12; Pl.'s Opp'n (#23) 6). Fonseca had heard from Gilmore that the position of Secondary Marketing Specialist would not be open. (Pl.'s Opp'n (#23) 6). Fonseca submitted her resignation on September 27, 2006, effective October 13, 2006. (Def.'s Mot. (#20) 12; Sayre Declaration). Greater Nevada hired Jeffrey Kleinops, who had contacted Gilmore via a referral from a mutual friend a week before, as a Secondary Marketing Specialist at $35,000 per year starting on or about October 16, 2006. (Def.'s Mot. (#20) 12; Pl.'s Opp'n (#23) 6; Ex. 8).

Shortly thereafter, Gilmore resigned effective November 27, 2006, about one year after he began working for Greater Nevada. (Def.'s Mot. (#20) 13). Kleinops resigned a few months later on March 28, 2007. (Id.). Subsequently, Taylor contacted Plaintiff to see if she would be interested in returning to the position of Secondary Marketing Specialist. (Id.). He told her that Gilmore had left and that he would not hold her issues with Gilmore against her. (Id.). Plaintiff did not have a job at this time and she wanted one, but she declined Taylor's offer. (Id.). She told him she felt there was "too much water under the bridge." (Id.). She didn't tell Taylor that she was "scared" to come back because she had submitted a complaint with the Nevada Equal Rights Commission. (Id.). They never got to the point of discussing salary. (Id.). Taylor later hired a new Secondary Marketing Specialist at the rate of $45,000

5

1  per year. (Id.).

2  Plaintiff filed charges of discrimination with the United States Equal Employment
3  Opportunity Commission ("EEOC"). (Complaint (#1) 6). The EEOC issued a "Right-to-Sue"
4  letter dated September 13, 2007 indicating that the EEOC was unable to solve the
5  controversy, but was not prepared to take further efforts. (Id.).

6  Plaintiff subsequently filed her Complaint (#1) on November 30, 2007. In her First
7  Cause of Action, Plaintiff alleges that Defendant subjected her to a discriminatory
8  environment, failed to remedy that environment, and demoted her on the basis of her national
9  origin in violation of Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C. § 2000(e) et.
10  seq. In her Second Cause of Action, Plaintiff alleges that Defendant subjected her to
11  discriminatory actions, failed to remedy the situation, and eliminated her position in violation
12  of the Age Discrimination in Employment Act, 29 U.S.C. § 621. In her Third Cause of Action,
13  Plaintiff alleges that Defendant subjected her to a discriminatory environment on the basis of
14  her gender and failed to remedy that environment in violation of Title VII. In her Fourth Cause
15  of Action, Plaintiff alleges that Defendant terminated her position of Secondary Marketing
16  Specialist in retaliation for her opposition and complaints of discriminatory practices,
17  statements, and conduct in violation of Title VII. In her Fifth Cause of Action, Plaintiff alleges
18  that Defendant constructively discharged Plaintiff by making her working conditions
19  intolerable.

20  On May 27, 2009, the Court dismissed Defendant Derry Gilmore from the action without
21  prejudice pursuant to Federal Rule of Civil Procedure 4(m).

22  ## II. LEGAL STANDARD

23  Summary judgment "should be rendered if the pleadings, the discovery and disclosure
24  materials on file, and any affidavits show that there is no genuine issue as to any material fact
25  and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The
26  burden of demonstrating the absence of a genuine issue of material fact lies with the moving
27  party, and for this purpose, the material lodged by the moving party must be viewed in the light
28  most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157

(1970); Martinez v. City of Los Angeles, 141 F.3d 1373, 1378 (9th Cir. 1998). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986); S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982).

If the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, then the respondent must show by specific facts the existence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). "A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978); see also Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993) ("[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free . . . to grant summary judgment."). Moreover, "[i]f the factual context makes the non-moving party's claim of a disputed fact implausible, then that party must come forward with more persuasive evidence than otherwise would be necessary to show there is a genuine issue for trial." Blue Ridge Ins. Co. v. Stanewich, 142 F.3d 1145, 1149 (9th Cir. 1998) (citing Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987)). Conclusory allegations that are unsupported by factual data cannot defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

## II. ANALYSIS

### A.   The Title VII Discrimination Claims

Defendant contends that Plaintiff cannot sustain a claim of national origin or gender discrimination in violation of Title VII because she cannot establish a prima facie case of discrimination, and even if she could, she cannot establish that the stated reason for the

1 elimination of her position was a pretext for discrimination. (Def.'s Mot. (#20) 14). Therefore,
2 Defendant argues that it is entitled to summary judgment on Plaintiff's national origin
3 discrimination claim. Plaintiff argues that the Court should deny Defendant's Motion (#20)
4 because there exist genuine issues of material fact wherein a jury could find for Plaintiff on
5 her claims. (Pl.'s Opp'n (#23) 7).

6      **1.   Plaintiff's Prima Facie Case**

7      In order to establish a prima facie case of discrimination under Title VII, a plaintiff must
8 provide evidence that gives rise to an inference of unlawful discrimination. Nidds v. Schindler
9 Elevator Corp., 113 F.3d 912, 917 (9th Cir. 1996). A prima facie case can be based on direct
10 or circumstantial evidence of discriminatory intent or a rebuttable presumption of
11 discrimination arising from factors set forth in McDonnell Douglas. See Dominguez-Curry v.
12 Nev. Transp. Dep't, 424 F.3d 1027, 1037 (9th Cir. 2005). Here, Plaintiff relies on the
13 McDonnell Douglas framework.

14      In order to establish a prima facie Title VII discrimination case under McDonnell
15 Douglas, a plaintiff must show that: "(1) [she] belonged to a protected class; (2) [she was]
16 qualified for her job; (3) [she was] subjected to an adverse employment action; and (4)
17 similarly situated employees not in [her] protected class received more favorable treatment."
18 Moran v. Selig, 447 F.3d 748, 753 (9th Cir. 2006); see also McDonnell Douglas Corp. v.
19 Green, 411 U.S. 792, 802 (1973). "The requisite degree of proof necessary to establish a
20 prima facie case for Title VII . . . on summary judgment is minimal and does not even need to
21 rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885,
22 889 (9th Cir. 1994) (citing Yartzoff v. Thomas, 809 F.2d 1371, 1375 (9th Cir. 1987), cert.
23 denied, 498 U.S. 939 (1990)).

24      Here, the Parties do not dispute that Plaintiff has met the first three elements of a prima
25 facie case of discrimination. Plaintiff is a female of Chinese descent who competently
26 performed the duties of her position. (Complaint (#1) 3). In fact, Taylor has testified that
27 Plaintiff "was quite good at what she did." (Def.'s Mot. (#20) Ex. 2, 7). Furthermore,
28 Defendant has conceded that Plaintiff suffered an adverse employment action when her

1   position was eliminated. (Id. at 14).

2   Defendant, however, argues that Plaintiff has failed to establish the fourth element of
3   a national origin or race discrimination claim, namely that members outside her protected
4   class were treated more favorably than Plaintiff. (Id.). Plaintiff contends that she was treated
5   less favorably than members outside her class because, during the company's restructuring
6   efforts, her position was the only one eliminated, and she was not offered a reduction in salary
7   in lieu of elimination. (Pl.'s Opp'n (#23) 10). The only other employee affected by the
8   restructuring effort was Bartels, a non-Chinese employee, who was offered a salary reduction
9   in lieu of termination. (Id.). Plaintiff provides evidence that her position was later filled by a
10  Caucasian male, Jeffrey Kleinops. (Id. at 11).

11  Defendant counters that Plaintiff was not treated less favorably than similarly situated
12  non-Chinese employees because Kleinops was not hired to replace Snider, but Dionny
13  Fonseca, who had taken over Plaintiff's duties when she left, and he was paid $16,000 a year
14  less than Plaintiff was. (Def.'s Mot. (#23) 14). However, this fact does not show that Plaintiff
15  was not treated less favorably than other employees outside the protected class. Therefore,
16  Plaintiff has established that she was treated less favorably than all the other employees
17  outside her protected class who were not affected by the restructuring. Accordingly, Plaintiff
18  has met the final requirement and has established a prima facie case of national origin and
19  racial discrimination in violation of Title VII.

20  With regard to gender discrimination, Plaintiff contends that she was treated less
21  favorably than employees outside her class because her position was the only one eliminated,
22  no males were affected by the company's restructuring, and the company later hired a new
23  Secondary Marketing Specialist who was male. (Pl.'s Opp'n (#23) 12-13). Defendant
24  counters that Plaintiff's duties were taken over by Dionny Fonseca, a female. (Def.'s Mot.
25  (#20) 14). Again, this fact does not show that Defendant treated Plaintiff as favorably as its
26  male employees. Therefore, Plaintiff has shown that she was treated less favorably than
27  employees outside her class (male employees) and has met the fourth element of a prima
28  facie case of discrimination. Accordingly, Plaintiff has also established a prima facie case of

gender discrimination in violation of Title VII.

> **2. Defendant's Legitimate, Nondiscriminatory Reason for Its Employment Decision**

"Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). Accordingly, once a plaintiff establishes a prima facie case of unlawful discrimination, "the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision." Wallis, 26 F.3d at 889 (citing Lowe v. City of Monrovia, 775 F.3d 998, 1005 (9th Cir. 1985)). A defendant meets this burden and rebuts the presumption of discrimination by offering evidence, which, if taken as true, permits the conclusion that there was a nondiscriminatory reason for the employment decision. Bodett v. CoxCom, Inc., 366 F.3d 736, 742 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).

Defendant asserts that Plaintiff's position of Secondary Marketing Specialist was eliminated in order to cut the company's salary costs. (Def.'s Mot. (#20) 14). In early 2006, Taylor directed his Vice President, Gilmore, to survey all employees and positions to determine who they could eliminate, because the company had been losing money and employee compensation benefits was the easiest fix. (Id.). Taylor expressed that he wanted to eliminate positions in loan processing, underwriting, or secondary marketing positions, but not sales. (Id.).

Gilmore reported back to Taylor with positions he thought could be eliminated, including Plaintiff's position. (Id. at 11). Taylor approved the elimination of Plaintiff's position because he believed Gilmore and Fonseca, Plaintiff's Secondary Marketing Assistant, could handle the duties. (Id.) Not only was Plaintiff the only other person in the Secondary Marketing Department, but at a salary of $51,000 annually, she was also the fourth highest paid person in Greater Nevada Mortgage Services after CEO Taylor, VP Gilmore, and Operations Manager Mary Porras. (Id. at 14-15). Mary Porras resigned her position during this time and was not replaced. (Id.). Taylor has testified that they would have had to "take

1 action" in the underwriting department had Porras not resigned. (Id. at Ex. 2, 11).  With this

2 explanation, Defendant has articulated a legitimate, nondiscriminatory reason for its actions.

3        **3.**    **Plaintiff Cannot Show Pretext**

4        In order to prevail after a defendant's articulation of a legitimate reason for an adverse

5 action, "the plaintiff must demonstrate that the employer's alleged reason for the adverse

6 employment decision is a pretext for another motive that is discriminatory." Wallis, 26 F.3d

7 at 889 (citing Lowe, 775 F.2d at 1005).  In other words, Plaintiff must now produce evidence

8 sufficient to create a genuine issue of fact as to whether, viewing the evidence the light most

9 favorable to Plaintiff, Defendant's reasons are pretextual. Chuang v. Univ. of Cal. Davis, Bd.

10 of Trustees, 225 F.3d 1115, 1126 (9th Cir. 2000).  "[A] plaintiff can prove pretext in two ways:

11 (1) Indirectly, by showing that the employer's proffered explanation is 'unworthy of credence'

12 because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that

13 unlawful discrimination more likely motivated the employer." Id. at 1127 (citing Godwin v. Hunt

14 Wesson, Inc., 150 F.3d 1217, 1220-22 (9th Cir. 1998)); see also Burdine, 450 U.S. at 256.

15 Additionally, a plaintiff need only show that the "protected characteristic was 'a motivating

16 factor' in an employment action, even if there were other motives." Costa v. Desert Palace,

17 Inc., 299 F.3d 838, 848 (9th Cir. 2002) (en banc) aff'd 539 U.S. 90 (2003); see also 42 U.S.C.

18 § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party

19 demonstrates that race, color, religion, sex, or national origin was a motivating factor for any

20 employment practice, even though other factors also motivated the practice.").  The Ninth

21 Circuit has held that a "plaintiff in an employment discrimination action need produce very little

22 evidence in order to overcome an employer's motion for summary judgment . . . . because 'the

23 ultimate question is one that can only be resolved through a searching inquiry—one that is

24 most appropriately conducted by a factfinder, upon a full record.'" Chuang, 225 F.3d at 1124

25 (quoting Schnidrig v. Columbia Mach., Inc. 80 F.3d 1406, 1410 (9th Cir. 1996)).

26        A plaintiff is required to produce "very little" direct evidence of discrimination in order

27 to survive summary judgment. Chuang, 225 F.3d at 1128 (citing Godwin, 150 F.3d at 1221;

28 Lowe, 775 F.2d at 1009).  "'Direct evidence is evidence, which, if believed, proves the fact [of

1   discriminatory animus] without inference or presumption.'" Godwin, 150 F.3d 1217, 1221 (9th

2   Cir. 1998) (citing Davis v. Chevron, U.S.A., Inc., 14 F.3d 1082, 1085 (5th Cir. 1994)) (change

3   in original).   Typically, direct evidence of discriminatory animus "'consists of clearly sexist,

4   racist, or similarly discriminatory statements or actions by the employer.'" Dominguez-Curry,

5   424 F.3d at 1028 (quoting Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1095 (9th Cir.

6   2005)). The Ninth Circuit has stated that "in this circuit, we have repeatedly held that a single

7   discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude

8   summary judgment for the employer." Dominguez-Curry, 424 F.3d at 1039 (citing Chuang,

9   225 F.3d at 1128; Cordova v. State Farm Ins. Co., 124 F.3d 1145, 1149 (9th Cir. 1997)).

10   "Where . . . the person who exhibited discriminatory animus influenced or participated in the

11   decisionmaking process, a reasonable factfinder could conclude that the animus affected the

12   employment decision." Dominguez-Curry, 424 F.3d at 1039-40 (citing Mondero v. Salt River

13   Project, 400 F.3d 1207, 1213 (9th Cir. 2005)). A decisionmaker need not have directed his

14   remark toward plaintiff, but only toward her class. Dominguez-Curry, 424 F.3d at 1038; see

15   also Coghlan v. Am. Seafoods Co. LLC, 413 F.3d 1090, 1095 n.6 (9th Cir. 2005) (holding that

16   even if an employer does not target his remarks directly at the plaintiff, "when evidence

17   establishes the employer's animus toward the class to which the plaintiff belongs, the

18   inference to the fact of discrimination against the plaintiff is sufficiently small that we have

19   treated the evidence as direct.'"). Furthermore, the remark need not have been made "in the

20   direct context of" an adverse employment decision. Reeves v. Sanderson Plumbing Products,

21   Inc., 530 U.S. 133, 152 (2000).

22          Courts have made numerous findings as to what qualifies as a discriminatory remark.

23   It should also be noted that when making these determinations, when a plaintiff claims more

24   than one type of impermissible bias, a court must consider a combination of those factors.

25   Lam v. Univ. of Haw., 40 F.3d 1551, 1562 (9th Cir. 1994) ("Asian women are subject to a set

26   of stereotypes and assumptions shared neither by Asian men nor by white women."). On one

27   end of the spectrum, "an egregious and bigoted insult," such as, "'two Chinks' in the

28   pharmacology department were 'more than enough'" is most certainty sufficient direct

evidence to preclude summary judgment for the employer, even when those remarks were not directed at plaintiffs. Chuang, 225 F.3d at 1128. Calling someone a "dumb Mexican" also qualifies as an "egregious and bigoted insult" that provides direct evidence of discriminatory animus. Cordova v. State Farm Ins. Cos., 124 F.3d 1145, 1149 (9th Cir. 1997). Other remarks that have qualified as direct evidence of discrimination include statements that employees are "too old to do their jobs anymore," Lanahan v. S. Nev. Health Dist., 2009 WL 395794 at *5 (D. Nev. Feb. 17, 2009), or that a director "did not want to deal with another female," Godwin, 150 F.3d at 1221.

Comments that indicate a ratification of stereotypes can also constitute direct evidence of discriminatory bias. See Lindahl v. Air France, 930 F.2d 1434, 1439 (9th Cir. 1991) (finding such evidence where employer testified that he believed female candidates for a job got "nervous" or "easily upset"); Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d 1104, 1112 (9th Cir. 1991) (direct evidence of sex discrimination where employee called plaintiff "an old warhorse" and her students "little old ladies"), overruled on other grounds, see Dominguez-Curry, 424 F.3d at 1041. In a closer case, the Ninth Circuit has recently held that a supervisor referring to plaintiff as "little girl" and joking about whether she "broke a nail" constituted not direct, but at least circumstantial evidence of discriminatory animus, even though the remarks occurred two years prior. EEOC v. Boeing Co., 2009 WL 938862 at *2 (9th Cir. April 08, 2009). At the other end of the spectrum, mere stray remarks that are ambivalent, not acted upon, or that do not give rise to an inference of discriminatory animus, are insufficient to establish pretext. See Nesbit v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir. 1993) (holding that "We don't necessarily like grey hair" is weak circumstantial evidence of discriminatory animus); Merrick v. Farmers Ins. Group, 892 F.2d 1434, 1438 (9th Cir. 1990) (hiring manager's comment that he chose a "bright intelligent, knowledgeable young man" over plaintiff was a mere stray remark insufficient to establish discrimination); Sherrell v. Winter, 2007 WL 61058 at *11 (D. Haw. Jan. 08, 2007) (holding that supervisor's comments that plaintiff was a "problem," that she "didn't want him," but that she was "kind of like stuck with him" are not evidence of discriminatory intent because they do not "even inferentially

1   reference [plaintiff's] race").

2   Viewing the evidence in the light most favorable to Plaintiff, the Court must evaluate

3   three remarks that Plaintiff claims evidence racial and/or national origin discrimination. The

4   first remark was made at the first staff meeting that Gilmore and Plaintiff both attended, shortly

5   after Gilmore was hired, on November 28, 2005. (Def.'s Mot. (#20) Ex. 1, 12; Ex. 3, 19).

6   Gilmore allegedly "yelled and screamed" at Plaintiff in front of about seven other employees,

7   saying something to the effect of, "Herlina, you're speaking too fast. Slow down, I don't

8   understand a single word you're saying because of your accent."[3] (Pl.'s Opp'n (#23) Ex. 2;

9   Ex. 1, 15; Ex. 4, 3 ). Even when viewing this evidence in the light most favorable to Plaintiff,

10  this evidence does not qualify as direct or even circumstantial evidence of discriminatory

11  intent. As in Sherrell, this statement does not even inferentially reference Plaintiff's race.

12  While he may have done so in a rude or humiliating manner, Gilmore was merely attempting

13  to understand what Plaintiff had to say to him. As noted above, Plaintiff has a strong accent

14  and can be difficult to understand. (Pl.'s Opp'n (#23) Ex. 4, 3).

15  The second remark Plaintiff offers as evidence of Gilmore's discriminatory animus

16  occurred in December of 2005. As described above, Bartels approached Gilmore and warned

17  him that "sometimes people in Oriental culture are not as verbal about, you know, saying that

18  offended me or please don't talk to me like that. And he . . . sort of laughed it off and said . . .

19  I dealt with lots of Japanese people when I worked on Wall Street . . . ." (Def.'s Mot. (#20) Ex.

20  3, 28). Standing alone, this statement may seem to ratify a racial stereotype and therefore

21  constitute direct evidence of discriminatory bias. However the context of the statement

22

23  [3] Again, Plaintiff maintains in her Response (#23) that Gilmore used the phrase "Asian"

24  accent" during this incident, but cannot point to any evidence supporting that allegation. As such, it is a conclusory statement unsupported by the undisputed facts, even when viewing

25  the evidence in the light most favorable to Plaintiff. Conclusory allegations that are unsupported by factual data cannot defeat a motion for summary judgment. Taylor v. List, 880

26  F.2d 1040, 1045 (9th Cir. 1989). Moreover, even if Gilmore did say, "I can't understand you because of your Asian accent," it would not qualify as direct evidence of discriminatory

27  animus. It is not discriminatory to use "Asian," in a descriptive, as opposed to an evaluative, manner. See Merrick, 892 F.2d at 1438 (holding that employer's comment that he chose a

28  "bright, intelligent, knowledgeable young man" did not raise a triable issue of fact with regard to age discrimination).

14

indicates otherwise. Gilmore was responding to a ratification of a stereotype by Bartels, that persons of a certain culture should be treated differently because they cannot or will not typically defend themselves. Gilmore was not generalizing from Japanese people on Wall Street to Plaintiff, but was responding to Bartels' generalization of "people in Oriental culture." Because he was responding to Bartels, Gilmore's statement simply does not provide direct evidence of his feelings, let alone animus, toward Plaintiff, toward Japanese people, toward people of Asian descent or Asian culture in general, or even how he felt about Bartels' stereotyped statement. At most, Gilmore's "Wall Street" comment is at least one inferential leap away from proving discriminatory animus, and therefore does not constitute direct evidence of unlawful animus.

The final statement Plaintiff offers with regard to race and/or national origin discrimination occurred in early 2006. As described above, Bartels placed her resume in a pile that Gilmore was to review. (Def.'s Mot. (#20) Ex. 3, 26). Her resume contained her previous married name, Fong. (Id.). Bartels reports that

> he came out a minute later with my old resume and he goes: And where did I get this Cheryl Fong one from? And I said jokingly, well, that's me . . . he became very red and then he said: Really, you were married to a Chinese man? Your kids are half Chinese? And I don't think it was just totally in jest, I think he, he was surprised by it.

(Id.). This remark is certainly not an "egregious or bigoted insult" on par with the terms used in Chuang and Cordova, but it certainly directly references race, in contrast with Sherell. However, even when taking into account Bartels' testimony that he looked surprised and turned red when he realized his mistake, Gilmore's comment does not provide direct evidence of discriminatory animus, however inappropriate it may have been. This impolite question is, at best, weak circumstantial evidence of discriminatory animus, because it is not on its face discriminatory and it was not directed at Plaintiff. The Court cannot read negativity or animus into Gilmore's question when the evidence does not direct that result. Even when viewing this evidence in a light most favorable to Plaintiff, to read racial bias or animus into Gilmore's question would require inference or presumption. Therefore, this third remark does not qualify as direct evidence of discriminatory animus on the part of Gilmore.

1    Plaintiff also attempts to establish pretext "by showing that the employer's proffered

2  explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not

3  believable." Chuang, 225 F.3d at 1127 (citing Godwin, 150 F.3d at 1220-22). "Such

4  [circumstantial] evidence of 'pretense' must be 'specific' and 'substantial' in order to create a

5  triable issue with respect to whether the employer intended to discriminate." Godwin, 150

6  F.3d at 1222 (citations omitted). Plaintiff offers that Defendant's attempt to eliminate costs

7  and save money was little affected by the restructuring. (Pl.'s Mot. (#23) 14). Taylor testified

8  that Defendant was losing approximately $60,000 per month, about $180,000 per quarter

9  during the relevant time period. (Pl.'s Mot. (#23) Ex. 5, 16). Plaintiff alleges that the

10  elimination of Plaintiff's position at $51,000 and the reduction of Bartels' salary by $10,000

11  saved Defendant approximately $5,084 or 8.5% of what it was losing monthly. (Pl.'s Mot.

12  (#23) 14). According to Bartels, during the period that Defendant was losing money at the end

13  of May, 2006, Gilmore and two employees went to a conference in Washington, D.C. that was

14  unnecessary because the company had already been approved for an FHA loan. (Pl.'s Mot.

15  (#23) 14-15 n. 8). She also reports that Gilmore had her book the three employees on a first

16  class flight and in the Ritz Carlton Hotel. (Id.).

17    Though eliminating Plaintiff's salary may have only saved Defendant less than eight

18  percent of what it was losing monthly, the restructuring still saved Defendant money, a

19  legitimate business goal, especially since Plaintiff was the third highest earner in the company

20  (after Porras resigned), and in a department that Taylor believed could have used some

21  cutting. While Gilmore's trip to Washington, D.C. may or may not have been imprudent or a

22  waste of money, this circumstantial evidence does not come close to the "specific" or

23  "substantial" evidence necessary to show that an employer's proffered reason is a pretext.

24  Gilmore's trip is not at all specific to Plaintiff's termination, and the evidence is not substantial.

25    With regard to gender discrimination, Plaintiff offers as direct evidence of discriminatory

26  animus that before any plans of restructuring came up, Gilmore told Porras that he wanted to

27  replace Plaintiff with "some guy he had in mind." (Pl.'s Mot. (#23) Ex. 2). This evidence is

28  weaker than the evidence offered to show racial or national origin discrimination, and as such

1  does not qualify as direct evidence of discriminatory animus towards women on the part of Mr.

2  Gilmore. While the remark shows that Gilmore did seek to replace Plaintiff, it does not show

3  that he wanted to replace her because he did not like or approve of her gender. The evidence

4  simply shows that he had a person he knew in mind, and that person could be described as

5  a "guy." The remark does not show that he wanted to replace Plaintiff because she was

6  female, and that the person he thought of to replace her was suitable because he was a male.

7  To read that kind of discriminatory animus into this stray remark would require an inferential

8  leap.

9      Even when viewing the cumulative effect of the evidence in a light most favorable to

10 her, Plaintiff has failed to produce direct or circumstantial evidence of race/national origin or

11 gender discrimination sufficient to "demonstrate that the employer's alleged reason for the

12 adverse employment decision is a pretext for another motive that is discriminatory." Wallis,

13 26 F.3d at 889 (citing Lowe, 775 F.2d at 1005). Though Gilmore may have acted

14 inappropriately toward Plaintiff, or even "targeted" her, "a personality conflict is insufficient to

15 trigger the protections of Title VII." Vasquez v. County of Los Angeles, 349 F.3d 634, 654 (9th

16 Cir. 2003). Plaintiff has not shown that discriminatory animus was more likely a motivating

17 factor for the decision to eliminate her position than was the legitimate reason of eliminating

18 costs. Plaintiff has also not shown that Defendant's proffered reason is unworthy of credence.

19 Accordingly, the Court grants Defendant's Motion for Summary Judgment (#20) with regard

20 to Plaintiff's claims for national origin/race and gender discrimination, her First and Third

21 causes of action.

22 **B.    The Age Discrimination Claim**

23     Under the Age Discrimination in Employment Act ("ADEA"), it is "unlawful for an

24 employer to fail or refuse to hire or to discharge any individual or otherwise discriminate

25 against any individuals with respect to his compensation, terms, conditions, or privileges of

26 employment because of such individual's age . . . ." 29 U.S.C. § 623(a). To establish a prima

27 facie case of age discrimination under the ADEA, a plaintiff must show that she (1) was a

28 member of a protected class; (2) was performing her job in a satisfactory manner; (3) was

1  subjected to an adverse employment action; and (4) was replaced by a substantially younger

2  employee with equal or inferior qualifications. See Wallis, 26 F.3d at 891; Smith v. FJM Corp.,

3  2009 WL 703482 at *9 (D. Nev. March 16, 2009). Defendant argues that Plaintiff has failed

4  to establish the fourth element of a prima facie case of age discrimination. (Def.'s Mot. (#20)

5  14).

6       As in Title VII cases, once a plaintiff establishes a prima facie case of discrimination,

7  the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the

8  adverse action.  Sischo-Nownejad, 934 F.2d at 1109.  Once the employer articulates a

9  nondiscriminatory reason for the employment decision, the burden shifts back to the plaintiff

10  to show that the employer's reason was a pretext for discrimination.  Id.  A plaintiff may

11  establish pretext "either directly by persuading the court that a discriminatory reason more

12  likely motivated the employer or indirectly by showing that the employer's proffered

13  explanation is unworthy of credence." Godwin, 150 F.3d at 1220 (citing Burdine, 450 U.S. at

14  256 (1981)).

15       Defendant argues that Plaintiff has failed to establish the fourth element required to

16  establish a prima facie case of age discrimination because she was not replaced with a

17  substantially younger employee with equal or inferior qualifications. (Def.'s Mot. (#20) 14).

18  Plaintiff maintains that Gilmore intended to replace Plaintiff with Jeffrey Kleinops, a younger

19  male, that he had in mind since early 2006. (Pl.'s Opp'n (#23) 12).

20       Plaintiff cannot maintain her claim that she was replaced by a younger employee.

21  Firstly, Plaintiff's claim that Gilmore had a certain young male, Kleinops, in mind to replace

22  her all along is simply unsupported by the evidence.  Although Porras told Plaintiff that

23  Gilmore did want to replace Plaintiff with "some guy" he had in mind, Plaintiff has not

24  established that this person was Kleinops.  In fact, the Complaint (#1) alleges that in early

25  2006 Gilmore told Porras that he wanted to replace Plaintiff with an individual he knew from

26  the East coast. (Complaint (#1) 4).  Kleinops was originally from Texas and had been working

27  in Northern Nevada. (Def.'s Mot. (#20) Ex. 2, 6).  Moreover, Kleinops did not apply for the

28  position until September 21, 2009 following Fonseca's resignation, months after Plaintiff

18

1   resigned in June.  In addition, even if Gilmore had Kleinops in mind all along, Plaintiff was
2   admittedly replaced by Fonseca, not Kleinops.  (Pl.'s Opp'n (#23) 6).  Fonseca was a
3   Secondary Marketing Assistant who was a female two years younger than Plaintiff and also
4   within the protected class. (Def.'s Mot. (#20) 14). Fonseca resigned in late September of
5   2006, and Kleinops was hired to replace her starting in October of 2006. (Id. at 12; Sayre
6   Declaration).  Kleinops was hired at the rate of $35,000 per year, where Plaintiff was making
7   $51,000 at the time of her termination, and she was also working with an Assistant, Fonseca.
8   (Id.).  Accordingly, because she was not replaced by a younger employee, Plaintiff has not
9   established a prima facie case of age discrimination under this standard.

10      Alternatively, the Ninth Circuit has applied the classic McDonnell Douglas framework
11  to age discrimination claims, which differs from the test above in the fourth factor: "(4) similarly
12  situated individuals outside [her] protected class were treated more favorably, or other
13  circumstances surrounding the adverse employment action give rise to an inference of
14  discrimination." Whitman v. Mineta, 541 F.3d 929, 932 (9th Cir. 2008) (quoting Peterson v.
15  Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004)) (internal quotation marks omitted);
16  see also Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1207 (9th Cir. 2008) (holding that
17  the McDonnell Douglas framework applies to ADEA claims).

18      Under the McDonnell Douglas framework, Plaintiff may have established a prima facie
19  case.  As the only employee whose position was eliminated, Plaintiff was treated less
20  favorably than all other employees.  As some employees were under the age of forty and
21  therefore outside her class, Plaintiff arguably has shown that she was treated less favorably
22  than younger employees.  However, because the only further evidence of age discrimination
23  Plaintiff offers is a birthday card, described below, she clearly cannot show that Defendant's
24  legitimate reason for her elimination was a pretext for age discrimination.  Therefore, even if
25  Plaintiff has established a prime facie case, her claim still fails at this summary judgment
26  stage.

27      Plaintiff also offers direct evidence in an attempt to establish a prima facie case of age
28  discrimination.  Plaintiff claims that Gilmore found out her age and made it known to the entire

1  company by writing "Happy 44th Birthday" on her birthday card.[4]  (Pl.'s Opp'n (#23) 12).

2  Though Gilmore's action may, again, be deemed impolite, it does not give rise to an inference

3  of age discrimination or discriminatory animus on the basis of age on Gilmore's part.

4  Therefore, even if Plaintiff could establish a prima facie case of age discrimination, she could

5  not show that Defendant's legitimate reason for eliminating her position was a pretext for

6  discrimination.

7        Accordingly, the Court grants Defendant's Motion for Summary Judgment (#20) with

8  regard to Plaintiff's ADEA age discrimination claim, her Second Cause of Action.

9  **C.  The Retaliation Claim**

10        Defendant claims that Plaintiff cannot establish a prima facie case of a Title VII

11  retaliation claim because she cannot establish that she was involved in a protected activity

12  and, even if she could, she cannot establish a causal link between involvement in a protected

13  activity and the elimination of her position.  (Def.'s Mot. (#20) 20, 21).  Defendant further

14  argues that should Plaintiff establish a prima facie case, she still cannot establish that the

15  legitimate reason articulated by Defendant for her elimination was a pretext for retaliation.  (Id.

16  at 22).  Plaintiff argues that she engaged in a protected activity because informal verbal

17  complaints qualify, circumstantial evidence is enough to establish a causal link, and a

18  reasonable juror could find that Defendant's stated reasons were pretextual.  (Pl.'s Opp'n

19  (#23) 21-23).

20        To make out a prima facie case of retaliation under Title VII or the ADEA, Plaintiff must

21  demonstrate that: "(1) she engaged in a protected activity, (2) she suffered an adverse

22  employment action, and (3) there was a causal link between her activity and the employment

23  decision." Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1065-66 (9th Cir. 2004) (quoting Raad

24

25      [4] Plaintiff also claims that Gilmore asked Fonseca about Plaintiff's age shortly after

26  being hired.  (Pl.'s Opp'n (#23) 11).  Fonseca then informed Gilmore that Plaintiff wanted to keep her age private.  (Id. at 11-12).  Plaintiff further alleges that Fonseca told her that

27  Gilmore then walked into an office and accessed Plaintiff's personnel file to determine her age, and then he told Fonseca that he knew Plaintiff's age.  (Id. at 12).  However, this

28  evidence constitutes inadmissible hearsay and so cannot be considered upon a motion for summary judgment under Federal Rule of Civil Procedure 56.

1   v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1196-97 (9th Cir. 2003)); see also

2   Connor v. Micron Tech., Inc., 2009 WL 2020839 at *1 (9th Cir. July 13, 2009). If a prima facie

3   case of retaliation is established and the employer articulates some legitimate non-retaliatory

4   reason for the challenged action, the plaintiff "must demonstrate a genuine issue of material

5   fact as to whether the reason advanced by the employer was a pretext." Brooks v. City of San

6   Mateo, 229 F.3d 917, 928 (9th Cir. 2000); see also Connor, 2009 WL 2020839 at *1.

7          "It shall be an unlawful employment practice for an employer to discriminate against any

8   of his employees . . . because he has opposed any practice made an unlawful employment

9   practice by this subchapter, or because he has made a charge, testified, assisted, or

10  participated in any manner in an investigation, proceeding, or hearing under this subchapter."

11  42 U.S.C. § 2000e-3(a); see also 29 U.S.C. § 623(d). This section of Title VII contains two

12  clauses, known as the "opposition clause" and the "participation clause." Sias v. City

13  Demonstration Agency, 588 F.2d 692, 694-95 (9th Cir. 1978). These clauses describe what

14  kind of "opposition" or "participation" constitutes a protected activity.

15         "The purpose of section 2000e-3's participation clause 'is to protect the employee who

16  utilizes the tools provided by Congress to protect his rights.'" Vasconcelos v. Meese, 907

17  F.2d 111, 113 (9th Cir. 1990) (quoting Sias, 588 F.2d at 695). The participation clause

18  therefore applies only to EEOC proceedings. Vasconcelos, 907 F.2d at 113 ("[T]he statutory

19  language specifically limits the participation clause of section 2000e-3 to proceedings 'under

20  this subchapter.' 42 U.S.C. § 2000e-3. Accusations made in the context of charges before

21  the Commission are protected by statute; charges made outside of that context are made at

22  the accuser's peril."); see also Greisen v. City of N. Las Vegas, 251 Fed. App'x 462, 463 (9th

23  Cir. 2007) (holding that Plaintiff who was interviewed informally by employer with regard to

24  another employee's internal complaint of harassment had no claim under the participation

25  clause because she did not participate in any proceedings concerning that employee's formal

26  EEOC complaint).

27         Porras never filed a charge of discrimination with an outside agency, nor did she file

28  a complaint in court. (Sayre Declaration). Therefore, with regard to Porras' internal complaint

1  about Gilmore, Plaintiff could not have "participated" in any manner in any sort of proceeding
2  that would qualify her for participation clause protection.  Though Plaintiff did submit her own
3  charge of discrimination with the EEOC, and subsequently, a lawsuit in this Court, she did not
4  take these actions while she was employed.  Therefore, Defendant could not possibly have
5  eliminated Plaintiff's position in retaliation for her own complaints.  Accordingly, Plaintiff has
6  not established that she engaged in a protected activity under the participation clause of
7  section 2000e-3.

8      In contrast with the participation clause, under the opposition clause, the Ninth Circuit
9  has held that

10     [m]aking an informal complaint to a supervisor is . . . a protected activity.
       Furthermore, an employee's complaint about the treatment of others is
11     considered a protected activity, even if the employee is not a member of the
       class that [she] claims suffered from discrimination, and even if the
12     discrimination [she] complained about was not legally cognizable.

13  Ray v. Henderson, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000) (citing EEOC v. Hacienda Hotel,
14  881 F.2d 1054, 1514 (9th Cir. 1989) and Moyo v. Gomez, 40 F.3d 982 (9th Cir. 1994))
15  (internal citation omitted).  "'Opposition clause protection will be accorded whenever the
16  opposition is based on a reasonable belief that the employer has engaged in an unlawful
17  employment practice.'" Freitag v. Ayers, 468 F.3d 528, 541 (9th Cir. 2006) (quoting Moyo v.
18  Gomez, 40 F.3d 982, 984 (9th Cir. 1994)) (emphasis in original).  For this reason, "[a]n
19  employee need not establish that the opposed conduct in fact violated the Act in order to
20  establish a valid claim of retaliation.  That is, an employee may fail to prove an 'unlawful
21  employment practice' and nevertheless prevail on [her] claim of unlawful retaliation." Learned
22  v. City of Bellevue, 860 F.2d 928, 932 (9th Cir. 1988) (citing Sias, 588 F.2d at 695; Silver
23  v. KCA, Inc., 586 F.2d 138, 142 (9th Cir. 1978)) (internal citation omitted).

24      Plaintiff claims she informally voiced her complaint that Gilmore was discriminating
25  against her during her interview with Sayre on May 9, 2006, the interview instigated by Porras'
26  internal complaint.  (Pl.'s Opp'n (#23) 21).  During that interview, Plaintiff complained about
27  Gilmore's management style, about his insensitivity, about his "I have dealt with Japanese
28  people on Wall Street" comment, about the first staff meeting where he said he couldn't

22

1  understand her, about his general inability to understand her, and that she felt she was his

2  "main target." (Id.). However, in that same interview, Plaintiff also reports that she did not tell

3  Sayre that she felt Gilmore's comments were racially or ethnically insensitive, that she "didn't

4  make any complaint," but then says that she did complain, but never used the word

5  "discrimination."

6          Q. Okay. Did you, did you make a complaint of any kind of discrimination to
        Gerene [Sayre] during your interview with her?
7          A. Any kind of discrimination complaint?
        Q. Yeah.
8          A. I was called in as a witness, so basically I witness for Mary's [Porras']
        case, but I told Gerene of some issues. But I didn't make any complaint . .
9          . Because they were concentrating on Mary Porras' case at that point.
        Q. Okay. Did you ever make any complaint to Gerene about discrimination?
10         A. I, I complained to her, but I didn't use the word discrimination to her.
        . . .
11         Q. Okay. So you're talking about in your interview with Gerene in the Mary
        Porras investigation, you didn't use the word discrimination or complaint but
12         you told her about issues you had with Derry [Gilmore], is that what you're
        saying?
13         A. Correct.
        Q. Okay. Tell me about the issues you told her you had with Derry.
14         A. Told her about Derry's management style.

15 (Def.'s Mot. (#20) Ex. 1, 13). Though Plaintiff asserts that what she told Sayre during her

16 interview with regard to Porras' complaint constituted a discrimination complaint, the

17 undisputed evidence does not support that conclusory allegation. "Complaints about a

18 supervisor generally . . . are not protected actions." Ballard v. Portland Gen. Elec. Co., 293

19 Fed. App'x 448, 450 (9th Cir. 2008) (citing Learned v. City of Bellevue, 860 F.2d 928, 932 (9th

20 Cir. 1988)). Plaintiff does not allege that she complained to Human Resources or CEO Taylor

21 about Gilmore at any other point during her employment. Though Plaintiff is correct in

22 asserting that informally voicing a complaint to a superior constitutes a protected activity under

23 the opposition clause, Plaintiff has not shown that she did so. Plaintiff has not engaged in the

24 "appropriate informal opposition," Sias, 588 F.2d at 695, that would trigger opposition clause

25 protection.[5]  Therefore, Plaintiff cannot establish that she engaged in a protected activity

26 _____

27     [5] Although Plaintiff asserts that her participation in the Porras investigation entitles her
to protection under the participation clause, she has not made the alternative argument that
28 merely participating in the investigation of an internal complaint entitled her to protection
under the opposition clause. (Pl.'s Mot. (#23) 21, n.21). Furthermore, Plaintiff does not

1   under section 2000e-3 and cannot establish the first prong of a prima facie case of retaliation.

2       Even if Plaintiff could establish a prima facie case of retaliation, she cannot show that

3   Defendant's reason for eliminating her position was a pretext for retaliation.  Defendant

4   asserts that Plaintiff's position was eliminated because Taylor wanted to cut salary costs and

5   believed that Gilmore and Fonseca could handle Secondary Marketing without Plaintiff.

6   (Def.'s Mot. (#20) 21).   He directed Gilmore to look at Plaintiff's department and other so-

7   called "back office" positions because he wanted to place emphasis on sales.  (Id. at Ex. 2,

8   4).   The only other evidence of retaliation that Plaintiff presents is that her position was

9   eliminated just one month after her interview for the Porras investigation on May 9, 2006.

10  (Pl.'s Opp'n (#23) 23).  Plaintiff offers no direct evidence of Gilmore's retaliatory intent.  The

11  circumstantial evidence is not sufficient to establish that Defendant's legitimate, non-

12  discriminatory reason for eliminating her position was a pretext for retaliation.  Plaintiff cannot

13  meet her burden.

14      Accordingly, the Court grants Defendant's Motion for Summary Judgment (#20) with

15  regard to Plaintiff's retaliation claim, the Fourth Cause of Action.

16  **D.   Plaintiff's Claim for National Origin, Age and/or Gender Harassment**

17      Greater Nevada argues that, to the extent Plaintiff is attempting to allege a claim for

18  hostile work environment based on her age, sex, or national origin, any claim for such

19  harassment must fail as a matter of law. (Def.'s Mot. (#20) 16).  Specifically, Greater Nevada

20  argues that the alleged conduct is not sufficiently severe or pervasive to support a claim for

21

22  oppose Defendant's assertion that merely participating in an investigatory interview regarding
    Porras' complaint does not constitute opposition to an unlawful practice.  (Def.'s Mot. (#20)
23  20).  However, a recent Ninth Circuit case suggests that her interview may have qualified as
    a protected activity under the opposition clause.  See Greisen, 251 Fed. App'x at 463
24  (assuming, for the sake of the decision, that plaintiff's informal interview with regard to another
    employee's internal complaint qualified as a protected activity under the opposition clause).
25  However, Plaintiff bases her opposition clause argument on her belief that she complained
    about Gilmore's discrimination against her based on her national origin and/or race, and that
26  she did so during that interview.  (Pl.'s Opp'n (#23) 20-21).  In fact, Plaintiff asserts that "the
    true issue becomes whether [Plaintiff] has alleged facts demonstrating she informally voiced
27  a complaint to a superior regarding an unlawful employment activity under Title VII."  (Pl.'s
    Opp'n (#23) 20).  Plaintiff does not allege that she informally voiced a complaint about
28  Gilmore discriminating against Porras on the basis of age.

24

1   harassment. (Id. at 18). Moreover, Greater Nevada argues that even if the alleged conduct
2   could support a claim for harassment, Greater Nevada is entitled to summary judgment
3   because Plaintiff failed to complain. (Id. at 16). Plaintiff argues that summary judgment is
4   improper because viewing all the circumstances together, a reasonable juror could find that
5   Gilmore's conduct towards Plaintiff was sufficiently severe and pervasive to support a hostile
6   work environment claim. (Pl.'s Opp'n (#23) 18-19).

7        Hostile work environment claims based on racial harassment are reviewed under the
8   same standard as those based on sexual harassment. National R.R. Passenger Corp. v.
9   Morgan, 536 U.S. 101, 116 n.10 (2002). To establish a claim for hostile work environment,
10  Plaintiff must show: (1) that she was subjected to verbal or physical conduct of a sexual nature
11  or of a harassing nature because of his or her race or age, (2) the conduct was unwelcome,
12  and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of
13  Plaintiff's employment and create an abusive working environment. Fuller v. City of Oakland,
14  47 F.3d 1522, 1527 (9th Cir. 1995). The work environment must both subjectively and
15  objectively be perceived as abusive. Id. Whether the workplace is objectively hostile must
16  be determined from the perspective of a reasonable person with the same fundamental
17  characteristics, and must be measured based on the totality of the circumstances. Id. "Simple
18  teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount
19  to discriminatory changes in the terms and conditions of employment. Faragher v. City of
20  Boca Raton, 524 U.S. 775, 788 (1998) (internal citations omitted). Similarly, the "mere
21  utterance of an ethnic or racial epithet which engenders offensive feelings in an employee"
22  is not, by itself, actionable under Title VII. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67
23  (1986) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1972)). However, persistent
24  subjection to racial or sexual derogation can alter the conditions of employment. Woods v.
25  Graphic Communications, 925 F.2d 1195, 1201-02 (9th Cir. 1991).

26       In evaluating the objective hostility of a work environment, the factors to be considered
27  include: (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether it is
28  physically threatening or humiliating, or a mere offensive utterance, and (4) whether it

1    unreasonably interferes with an employee's work performance. McGinest v. GTE Service
2    Corp., 360 F.3d 1103, 1113 (9th Cir. 2004).

3          Plaintiff points to three incidents in which she claims she was subjected to harassment
4    based on her race and her age.  First, she presents the incident at the staff meeting where
5    Gilmore allegedly yelled at Plaintiff that he could not understand her.  (Pl.'s Opp'n (#23) 18).
6    Second, Plaintiff presents the incident where Gilmore made a statement (outside of Plaintiff's
7    presence) that he had "dealt with lots of Japanese people when he worked on Wall Street."
8    (Id.).  Third, Plaintiff points to an incident where Gilmore found out Plaintiff's age and wrote
9    "Happy 44th Birthday" on her birthday card, which informed the entire company about
10   Plaintiff's age.   (Id.).   Finally, Plaintiff adds that she was aware of Gilmore's alleged
11   harassment of other employees.  (Id.).

12         Even accepting these allegations as true and viewing the evidence in the light most
13   favorable to Plaintiff, Plaintiff has failed to establish that Gilmore has engaged in offensive
14   conduct that is so severe as to alter her working conditions.  Here, Plaintiff endured one
15   outburst at a meeting that she felt was based on her race.  The other allegedly offensive
16   comment regarding "Japanese people" was not made in Plaintiff's presence, and was not
17   particularly severe.

18         In addition, Plaintiff has failed to establish that Gilmore engaged in conduct that
19   satisfies the pervasive requirement for a harassment claim under Title VII.  Even accepting
20   Plaintiff's evidence as true, these combined incidents do not rise to the level of conduct that
21   alters Plaintiff's working conditions.  The incident at the meeting appears to be an isolated
22   one, and the other three alleged incidents did not occur in Plaintiff's presence, nor were they
23   sufficiently severe either on their own or taken together.  Based on the totality of the
24   circumstances in this case, the Court cannot conclude that Gilmore's conduct was sufficiently
25   severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive
26   working environment.   Therefore, the Court grants summary judgment as to Plaintiff's
27   harassment claim.

28   ///

1   **E.      Plaintiff's Claim for Constructive Discharge**

2         Finally, in her Fifth Cause of Action, Plaintiff asserts a claim for constructive discharge.

3   Greater Nevada argues that summary judgment should also be granted as to this claim

4   because Plaintiff has not shown that illegal discrimination or harassment created the

5   conditions forcing her resignation. (Def.'s Mot. (#20) 22). More specifically, Greater Nevada

6   argues that, based on the evidence presented, Plaintiff cannot, as a matter of law, establish

7   that she was forced to quit due to intolerable and discriminatory working conditions.  (Id.).

8   Plaintiff argues that Gilmore's allegedly discriminatory and harassing conduct combined with

9   his alleged unethical behavior and virtually "limitless power," led Plaintiff to feel there was no

10  other option but to quit. (Pl.'s Opp'n (#23) 28). Plaintiff contends that because a reasonable

11  person in her position could conclude that they had to quit, she has presented a genuine issue

12  of material fact to survive summary judgment.  (Id.).

13        Constructive discharge occurs when the working conditions deteriorate, as a result of

14  discrimination, to the point that they become "sufficiently extraordinary and egregious to

15  overcome the normal motivation of a competent, diligent, and reasonable employee to remain

16  on the job to earn a livelihood and to serve his or her employer." Brooks v. City of San Mateo,

17  229 F.3d 917, 930 (9th Cir. 2000) (quoting Turner v. Anheuser-Busch, Inc., 7 Cal. 4th 1238,

18  1246 (1994)). Put another way, to establish a claim for constructive discharge, the plaintiff

19  must show that conditions on the job were so intolerable that a reasonable person would leave

20  the job. Brooks, 229 F.3d at 930. While the determination of whether working conditions are

21  sufficiently egregious to support a constructive discharge theory is usually a jury question, the

22  Ninth Circuit has held that where no reasonable trier of fact could find that the employee was

23  driven from the workplace because of intolerable discriminatory conditions, the district court

24  may decide as a matter of law that a constructive discharge claim fails. Id. Moreover, where

25  a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a

26  hostile work environment claim, the Ninth Circuit has stated that it is impossible for her to meet

27  the higher standard of constructive discharge.  Id.

28        In this case, Plaintiff's complaints about her working conditions include: (1) the incident

27

where Gilmore yelled at Plaintiff that he could not understand her accent, (2) the two incidents that occurred outside of Plaintiff's presence where Gilmore made racially insensitive comments about people of Asian descent, (3) the assertion that Gilmore had "limitless power" and an "abrasive management style," (4) that Gilmore allegedly exaggerated the number of loans the company had "in the pipeline" which Plaintiff believed to be unethical. (Pl.'s Opp'n (#23) 26). Taken collectively, the Court cannot conclude that these circumstances amount to the extraordinarily or egregiously intolerable working conditions that would compel a reasonable employee to quit. While it appears that the environment at Plaintiff's workplace was at times subjectively unpleasant for her, she has failed to demonstrate that a reasonable trier of fact could objectively find that Gilmore's *discriminatory* conduct was so intolerable and egregious as to force resignation.

Moreover, Plaintiff has failed to demonstrate the severe or pervasive harassment necessary to support her hostile work environment claim. Under the Ninth Circuit's holding in Brooks, Plaintiff's constructive discharge claim must also fail as a matter of law. Brooks, 229 F.3d at 930. Specifically, because the standard for constructive discharge is higher than the "severe and pervasive" standard for hostile work environment claims, if Plaintiff cannot establish a hostile work environment claim, then it is legally impossible for her to meet the higher standard of constructive discharge. Id. Therefore, the Court grants summary judgment as to Plaintiff's fifth cause of action for constructive discharge.

### III. CONCLUSION

Accordingly, IT IS ORDERED that Greater Nevada, LLC's Motion for Summary Judgment (#20) is GRANTED in its entirety.

DATED: This 14th day of October, 2009.

UNITED STATES DISTRICT JUDGE